**MIDWESTERN WAFFLES, INC., and Rex P. Waldrop, Plaintiffs-Appellants, Cross-Appellees,**

v.

**WAFFLE HOUSE, INC., et al., Defendants-Appellees, Cross-Appellants.**

No. 83–8424.

United States Court of Appeals, Eleventh Circuit.

June 18, 1984.

W. Clark Goodwin, Manning G. Warren, III, J. Michael Rediker, Birmingham, Ala., K. Morgan Varner, III, Atlanta, Ga., for plaintiffs-appellants, cross-appellees.

Earle B. May, Jr., Kevin E. Grady, Atlanta, Ga., for defendants-appellees, cross-appellants.

Before TJOFLAT and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

PER CURIAM:

We AFFIRM the partial summary judgment of the district court, entered pursuant to Fed.R.Civ.P. 54(b), for the reasons set forth in its dispositive orders of March 15, 1982, and December 30, 1982, annexed hereto as Exhibits A and B, respectively.

EXHIBIT A

ORDER

INTRODUCTION

Before the court in this antitrust action are plaintiffs' motion for reconsideration of their motion for partial summary judgment and defendants' motion for reconsideration of their motion for summary judgment. Although the parties contend they cannot agree on any facts, the court will base this order on facts which appear from the record to be undisputed.

FACTS

Waffle House, Inc. (hereinafter "Waffle House") is a Georgia corporation with its principal offices in the Atlanta area. Its stock is owned principally by its officers and employees. Midwestern Waffles, Inc. (hereinafter "Midwestern Waffles") is an

Illinois corporation of which Rex Waldrop and Edwin Waldrop are shareholders.

Waffle House operates a trademark restaurant system with some unique features. It owns and operates some restaurants on the retail level in certain territories, and other territories have been exclusively allocated to franchisees for operation of Waffle House restaurants. Waffle House or Waffle House employees, officers, or shareholders have interests in corporations which own and operate certain of the Waffle House franchises.

Plaintiffs asked defendants for a Waffle House franchise in Selma, Alabama in late September or early October of 1972. Plaintiffs were told that the area was not available for a franchise because Alabama had already been allocated between the company and other franchisees for operation of Waffle House restaurants. Central Illinois was a territory available for a franchise at the time, and in late 1972 Midwestern Waffles, known at the time as Waldrop-Henry Waffles, Inc., became a Waffle House franchisee for that territory.

Rex Waldrop initially remained in Selma, Alabama while Steve Henry worked as the general manager for Midwestern Waffles in Illinois. After Steve Henry's resignation from Midwestern Waffles and the expansion of the franchise into the St. Louis area, Rex Waldrop moved to St. Louis to become general manager for Midwestern Waffles.

Midwestern Waffles opened two Waffle House restaurants, one in 1974 and one in 1976. Plaintiffs executed a Standard Franchise Agreement prior to the opening of each restaurant, and they also executed Area Development Agreements which controlled where they opened restaurants and whether they built additional ones. Orders were placed for plaintiffs' restaurant equipment with The Hickman Company, in which Waffle House had a financial interest. Metro Distributors, Inc., in which Waffle House also had a financial interest, helped arrange for vending machines for plaintiffs' restaurants. In 1977 Waffle House bought plaintiffs' restaurants from them, and plaintiffs are dissatisfied with the price paid them and the method of arriving at the price.

## REX WALDROP'S STANDING

Plaintiffs have brought this action pursuant to 15 U.S.C. § 15 which provides in pertinent part as follows:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

Defendants contend Rex Waldrop does not have standing to bring this action in his capacity as an officer, employee or stockholder of Midwestern Waffles, Inc. Mr. Waldrop asserts, however, that he has suffered injuries personal to him, specifically lost opportunities and expenses incurred because he left his job in Alabama and moved to Illinois, and he contends he has standing to seek recovery for those non-derivative injuries.

To have standing to bring an antitrust action a plaintiff must have suffered antitrust injury, which is injury of the type the antitrust laws were intended to prevent and which flows from that which makes a defendant's acts unlawful. The injury must reflect the anticompetitive effect of either the violation of antitrust law or of the anticompetitive acts made possible by the violation, and it should be the type of loss which a violation of antitrust law would be likely to cause. *Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 [97 S.Ct. 690, 50 L.Ed.2d 701] (1977). To have standing a person must be one against whom anticompetitive activity is directed, and not one who has merely suffered indirect, secondary, or remote injury. *Jeffrey v. Southwestern Bell*, 518 F.2d 1129 (5th Cir.1975). Incidental or consequential injury or injury remotely caused

by an antitrust violation does not give a plaintiff standing to complain that he has been injured by reason of anything forbidden in the antitrust laws. *Id.*

■ The court finds that the personal damages which Rex Waldrop seeks to recover are, at best, incidental to activity forbidden by antitrust law and not the type injury the antitrust laws were intended to prevent. *Markas [Martens] v. Barrett,* 245 F.2d 844 (5th Cir.1957). Accordingly, the court finds that Rex Waldrop does not have standing to bring this action.

## TERRITORIAL ALLOCATION

Plaintiffs contend that Waffle House and certain of its franchisees conspired to violate § 1 of the Sherman Act, 15 U.S.C. § 1, by horizontally dividing, allocating, and imposing restrictions regarding territories in which they and third parties could operate. If a horizontal restriction is proved a *per se* violation would be established. *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001 (5th Cir.1981).

■ Defendants contend their allocation of territories is a vertical restriction. The prevailing standard of analysis under § 1 of the Sherman Act for non-price vertical restrictions is the rule of reason. Under this rule the finder of fact weighs all circumstances of a case to determine whether a restrictive practice imposes an unreasonable restraint on competition and should therefore be prohibited. *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36 [97 S.Ct. 2549, 53 L.Ed.2d 568] (1977). If so, it is *per se* illegal. *Red Diamond Supply, Inc. v. Liquid Carbonic Corporation,* 637 F.2d 1001 (5th Cir.1981).

■ In order to prove that Waffle House's allocation of territories, each of which is an exclusive territory, is a horizontal restriction, plaintiffs will have to show that Waffle House and those of its franchisees alleged to be part of the combination or conspiracy agreed among themselves as to the division of territories. If Waffle House alone allocated the territories there is no *per se* violation of antitrust

law because exclusive dealing arrangements are to be analyzed under the rule of reason. *Aladdin Oil Company v. Texaco, Inc.,* 603 F.2d 1107 (5th Cir.1979). That Waffle House itself operates restaurants in certain territories does not, alone, change the standard of analysis. *Red Diamond Supply, Inc. v. Liquid Carbonic Corporation, supra; H & B Equipment Company, Inc. v. International Harvester Company,* 577 F.2d 239 (5th Cir.1978).

■ Whether or not Waffle House's territorial allocation is a vertical restriction or a horizontal restriction cannot be decided on motions for summary judgment because there is a question of fact as to who actually makes the decisions about division and allocation of territories. Plaintiffs have described in detail their evidence that certain franchisees which are affiliated with Waffle House participate in the decisions regarding allocation of territories. Defendants, however, have shown the existence of evidence that the decision is made by Waffle House alone without participation by any of the Waffle House employees, officers, or stockholders who own or are affiliated with franchises. Plaintiffs ask the court to look at the realities of the process of territorial allocation, citing authority for the proposition that a restriction which appears on paper to be vertical may nevertheless be horizontal in practice and that such a restriction is illegal *per se.* It is as to the realities of how allocation of territories are made that questions of fact exist. Accordingly, summary judgment on the issue of territorial allocation cannot be granted.

## TYING

■ Plaintiffs contend that Waffle House's requirements that its franchisees purchase equipment from approved sources constitute *per se* illegal ties in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. A tie is an arrangement under which a seller agrees to sell one product, the tying product, only on the condition that the buyer also purchase a second product, the tied product. A tie is a *per se* violation of antitrust law, however, only if the seller

has sufficient economic power with respect to the tying product to restrain free competition in the market for the tied product and if a not insubstantial amount of interstate commerce is affected. *United States Steel Corporation v. Fortner Enterprises, Inc.*, 429 U.S. 610 [97 S.Ct. 861, 51 L.Ed.2d 80] (1977); *Kentucky Fried Chicken Corporation v. Diversified Packaging Corporation*, 549 F.2d 368 (5th Cir.1977). Additionally, a tie is illegal only if the seller of the tying product has a financial interest in the source of the tied product. *Keener v. Sizzler Family Steak Houses*, 597 F.2d 453 (5th Cir.1979).

Plaintiffs contend the Waffle House franchise is the tying product in this case and that equipment and vending services, which franchisees were required to obtain from an approved source, are the tied products. The Hickman Company was the only approved source for certain equipment, and Metro Distributors, Inc. was the only approved source for vending services.

■ Defendants contend that as to the vending services there are not two separate products which could be tied because vending income, part of which was collected by Metro Distributors, Inc. and paid to Waffle House, was an additional franchise fee and not a separate payment for a product distinct from the franchise. Although such has been held to be the case with respect to lease payments, a license fee, and a security deposit paid to a franchisor, *Principe v. McDonald's Corporation*, 631 F.2d 303 (4th Cir.1980), *cert. denied*, [451] U.S. [970, 101 S.Ct. 2047, 68 L.Ed.2d 349] (May 4, 1981), the court finds that vending services are not such "an essential ingredient of the franchised system's formula for success" that they should be treated as part of the franchise itself. 631 F.2d at 309.

There is some question as to whether a trademarked product has sufficient economic power that it can be an illegally tying product. In *Kentucky Fried Chicken Corporation v. Diversified Packaging Corporation, supra,* the franchisor conceded this point. A few courts have been presented with the issue, but the question has not been settled as a matter of law.

■ The leading case on economic power in the tying context is *United States Steel Corporation v. Fortner Enterprises, Inc., supra,* in which the Supreme Court emphasized the importance of uniqueness of the alleged tying product. This court finds that it must be determined by the trier of fact whether the Waffle House franchise system is unique in the sense required by the Supreme Court. If competitors are in some way prevented from offering a franchise comparable to a Waffle House franchise, the court will find that a Waffle House franchise can be a tying product.

There is no contention that there is not a sufficient amount of interstate commerce affected for an illegal tie to be found, and it is undisputed that Waffle House has a financial interest in the Hickman Company and in Metro Distributors, Inc. There are, however, questions of fact about the extent to which plaintiffs' purchase of the Waffle House franchise was conditioned on the purchase of certain equipment from The Hickman Company and vending services from Metro Distributors, Inc.

■ An approved source requirement is not, alone, illegal. *Kentucky Fried Chicken Corporation v. Diversified Packaging Corporation, supra.* Only if a franchisee is coerced into purchasing products from a company in which the franchisor has a financial interest does an illegal tie exist. *Id.* Defendants contend that plaintiffs never sought to purchase equipment or obtain vending services from sources other than The Hickman Company and Metro Distributors, Inc. Plaintiffs' position is that to have done so would have been futile because they had been told that no other sources would be approved. Each of these contentions presents disputes of fact. Unless plaintiffs can prove they were coerced into purchasing equipment and vending services from The Hickman Company and Metro Distributors, Inc., their claim that illegal ties existed will fail.

■ Even if plaintiffs can show the existence of an illegal tie, defendants can still defeat the claim by showing that the tie constitutes a necessary device for controlling the quality of the end product sold to the consuming public by a franchisee. This defense is available because of the unique nature of franchises and the fact that in the franchise context ties may serve legitimate purposes. *Kentucky Fried Chicken Corporation v. Diversified Packaging Corporation, supra.* For this defense to be successful, however, defendants would have to show that the tie is the method of maintaining quality that imposes the least burden on commerce. *Id.*

Defendants assert that plaintiffs have not shown that The Hickman Company or Metro Distributors, Inc. charged more than market rates for the equipment or the vending services. Although the issue is not determinative of whether an illegal tie existed, *United States Steel Corporation v. Fortner Enterprises, Inc., supra,* it is relevant to the issue of whether plaintiffs have suffered antitrust injury. The question of injury is treated separately in this order.

## MONOPOLY

Plaintiffs contend that defendants have violated § 2 of the Sherman Act, 15 U.S.C. § 2, which provides in pertinent part as follows:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony ...

Plaintiffs' contention in this respect depends on a finding that the relevant product market for the alleged monopoly is the Waffle House franchise system. Because the court finds this not to be the case, it will be unnecessary to consider whether the other elements of a monopoly, attempted monopoly, or conspiracy to monopolize are present.

■ The leading case on relevant product market is *United States v. E.I. DuPont de Nemours & Company,* 351 U.S. 377 [76 S.Ct. 994, 100 L.Ed. 1264] (1956). In that case the Supreme Court stated that a party has monopoly power if it has over any part of trade or commerce the power of controlling prices or unreasonably restricting competition. The Court recognized that in a sense there is monopoly power over every non-standard commodity because each manufacturer has the power over price and production of his product. The Court found, however, that this power which a manufacturer has over a trademarked or unique product is not the power that constitutes an illegal monopoly. Instead, whether there is control of the relevant market depends on the availability of alternative commodities and the interchangability of products which have similar uses considering price, characteristics, and adaptability. If price is controlled and competition restricted with respect to a product for which there are no reasonable substitutes available in the market, there is monopoly power.

■ In *United States v. E.I. DuPont de Nemours & Company,* the Supreme Court considered whether DuPont was guilty of a monopoly because it controlled the cellophane market. The Court found that the relevant product market was the market for flexible packaging materials and not for cellophane alone because other flexible packaging materials are reasonably interchangeable with cellophane for the purposes for which cellophane is produced, taking price, use, and qualities into consideration. Similarly, this court finds that the relevant product market for determining whether Waffle House is engaged in a monopoly is restaurants similar to Waffle Houses—those with similar menus, similar hours, and similar service. The court does not find that the relevant product market is all restaurants of every type, but it does find that there are other restaurants in the market available to consumers as reasonable substitutes for Waffle Houses. It is these restaurants which, along with Waffle Houses, constitute the relevant product

market. Waffle House is thus not engaged in a monopoly in violation of § 2 of the Sherman Act.

This conclusion is not inconsistent with a conclusion which might be reached that the Waffle House franchise system is sufficiently unique to have the economic power required for a tie to be found. It is the Waffle House franchise system, not the restaurants alone, which is the potentially tying product. The restaurants and the food served there are relevant to the determination of monopoly power.

Because the court has found no monopoly exists, it is unnecessary for it to consider any other elements of an alleged violation of § 2 of the Sherman Act. As to plaintiffs' claims that defendants have violated § 2 of the Sherman Act by engaging in a monopoly, attempting a monopoly, or conspiring to monopolize, defendants are granted summary judgment.

## MISCELLANEOUS ALLEGED RESTRAINTS OF TRADE

■ Plaintiffs allege that defendants have engaged in other restraints of trade such as requiring Waffle House's approval for building plans and specifications, requiring franchisees to devote full time to the operation of their restaurants, and requiring employees to wear particular attire. Defendants, in support of their motion for summary judgment, have cited authority for the fact that these alleged restraints of trade are ancillary to the Waffle House franchise and therefore not unlawful and that some have been specifically held valid. Plaintiffs have not responded to this argument advanced by defendants, and the court accordingly grants defendants' motion for summary judgment as to these miscellaneous alleged restraints of trade. Thus the only antitrust claims left in this action are plaintiffs' claims that defendants have engaged in horizontal territorial allocation and illegal tying in violation of § 1 of the Sherman Act.

## ANTITRUST INJURY

■ In order to survive a motion for summary judgment a plaintiff in an antitrust action must show substantial probative evidence of antitrust injury. *H & B Equipment Company, Inc. v. International Harvester Company,* 577 F.2d 239 (5th Cir.1978). Self-serving statements by a plaintiff's corporate officers are not, alone, substantial enough evidence of antitrust injury for a plaintiff to survive a motion for summary judgment. *Id.* Defendants contend plaintiffs have failed to show that they have substantial probative evidence of antitrust injury.

The discovery period in this case is still open for certain limited purposes. It is possible that the additional discovery which the court has approved will lead to evidence of antitrust injury. Accordingly, the court will defer ruling on the portion of defendants' motion for summary judgment which alleges that plaintiffs have not shown sufficient antitrust injury to be entitled to a trial of their antitrust claims. Within thirty (30) days of the close of the discovery period plaintiff Midwestern Waffles shall file a supplemental response to the portion of defendants' motion for summary judgment which raises the issue of antitrust injury. Plaintiff's supplemental response shall address only the issue of antitrust injury, and on the basis of that response the court will determine whether there exists the substantial probative evidence of injury required to survive a motion for summary judgment.

## STATUTE OF LIMITATIONS

■ Defendants' refusal to grant plaintiffs a franchise in Alabama occurred more than four years prior to the filing of the complaint in this action. Defendants contend plaintiffs' claim based on the alleged horizontal allocation of territories is barred by the statute of limitations. 15 U.S.C. § 15. Defendants do not contend plaintiffs' tying claim is barred because each payment under a contract which constitutes an illegal tie is new injury. Plaintiffs contend their later requests for a franchise in Alabama or in another southern state were new injuries which gave rise to new

causes of action for horizontal territorial allocation.

■ Where rights and liabilities are finalized by a contract or by denial of a contract, and any damages are at that time provable with certainty, the statute of limitations begins to run at that time. *City of El Paso v. Darbyshire Steel Company, Inc.*, 575 F.2d 521 (5th Cir.1978). Plaintiffs have not shown that the damages they seek for the alleged horizontal territorial allocation could not have been proved at the time defendants first told them no Alabama franchise was available.

■ There is, however, a question of fact on the issue of the statute of limitations. If plaintiffs' subsequent requests for a franchise territory in Alabama or another southern state were genuine, that is if plaintiffs had reason to believe the original decision not to grant them such a franchise did not still stand, there would be a new alleged injury when a genuine subsequent request was denied. If, however, plaintiffs' subsequent requests were futile and plaintiffs had reason to know they were futile, the statute of limitations will be found to bar plaintiffs' claim that defendants violated antitrust law by horizontally allocating territories.

## STANDING OF MIDWESTERN WAFFLES

■ Defendants contend plaintiffs cannot complain of the system of territorial allocation because plaintiffs not only agreed to it but specifically asked that their territory be an exclusive one. Mere acquiescence in a restrictive practice does not preclude an antitrust action, however. *Perma Life Mufflers, Inc. v. International Parts Corporation*, 392 U.S. 134 [88 S.Ct. 1981, 20 L.Ed.2d 982] (1968). There is evidence plaintiffs acquiesced in defendants' division of territories for its franchisees and that they sought the protection of an exclusive territory as had other franchisees. There appears to be no evidence, however, of plaintiffs' truly complete involvement and participation in the allegedly illegal arrangement, and even if there was

such evidence the Supreme Court did not hold that such conduct would bar an antitrust action. The court finds Midwestern Waffles has standing to challenge defendants' allocation of territories.

## STATE LAW CLAIMS

Defendants contend in their motion for summary judgment that Georgia law controls the state law issues in this case because the franchise agreement so provides and because of various contacts with the State of Georgia. Plaintiffs do not dispute this contention, and the court will apply Georgia law.

Defendants contend that Ga.Code Ann. § 2–1409 does not give plaintiffs a private right of action for damages for an antitrust violation and that under the circumstances of this case plaintiffs do not have a claim for unjust enrichment under Ga.Code Ann. § 3–107, a claim for tortious interference with contract, or a claim for unfair competition. Plaintiffs have not disputed any of these contentions, and as to each defendants are granted summary judgment.

■ Plaintiffs have also alleged fraud and breach of contract. There are some issues of fact as to each claim, such as whether defendants intended not to fulfill promises allegedly made to plaintiffs and whether there were agreements between the parties in addition to those set forth in the written contracts between them. There are not sufficient facts before the court, however, for it to determine what other questions of fact exist as to those claims or whether, instead, defendants are entitled to summary judgment on the claims as they contend. On the basis of the pleadings, the court can merely determine that there could be some set of facts which plaintiffs could prove to entitle them to judgment on the fraud and breach of contract claims. The court cannot find that defendants have shown themselves entitled to judgment as a matter of law on these claims, and defendants' motion for summary judgment on these claims is accordingly denied.

## CONCLUSION

Plaintiffs' motion for partial summary judgment is DENIED. There are questions of fact as to both their claim that defendants violated antitrust law by horizontally allocating territories to franchisees and their claim that defendants violated antitrust law by engaging in unlawful tying arrangements. Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. The court finds that Rex Waldrop does not have standing to bring this action and that defendants are entitled to summary judgment on plaintiffs' claim that defendants violated § 2 of the Sherman Act by engaging in a monopoly. Additionally, defendants are entitled to summary judgment as to plaintiffs' claims of restraints of trade other than the alleged horizontal territorial allocation and the alleged illegal ties, and defendants are entitled to summary judgment on plaintiffs' state law claims for antitrust damages, unjust enrichment, tortious interference with contract, and unfair competition. Midwestern Waffles has standing to challenge defendants' allocation of territories, and as to all other issues raised in defendants' motion for summary judgment, questions of fact exist.

Plaintiff Midwestern Waffles is DIRECTED to file a supplemental response to the portion of defendants' motion for summary judgment which raises the issue of antitrust injury within thirty (30) days of the close of discovery. The Clerk of this Court is DIRECTED to resubmit this file when that supplemental response is filed.

Plaintiffs' motion to compel discovery or to reopen discovery to permit supplementation of responses has also been submitted to the court. That motion has been treated in a separate order and requires no ruling at this time.

## EXHIBIT B

### ORDER

This antitrust action is again before the court on defendants' motion for summary judgment. Pursuant to this court's order of March 15, 1982, the only antitrust claims left in this action are plaintiff's claims that defendants have engaged in a horizontal territorial allocation and illegal tying, in violation of Section 1 of the Sherman Act. Further, in response to defendants' contention that plaintiff has failed to show that it has substantial probative evidence of antitrust injury, the court provided the following: "The discovery period in this case is still open for certain limited purposes. It is possible that the additional discovery which the court has approved will lead to evidence of antitrust injury." *Midwestern Waffles, Inc. v. Waffle House, Inc.*, No. C78–223A, at 11 (N.D.Ga. Mar. 15, 1982). On August 20, 1982, plaintiff provided a supplemental response to defendants' motion for summary judgment, which addressed the concerns of antitrust injury.

## I. FACTUAL BACKGROUND AND INITIAL CONSIDERATIONS.

In this court's order of March 15, 1982, the court found the following facts from the record to be undisputed. Waffle House, Inc. ("Waffle House") is a Georgia corporation with its principal offices in the Atlanta area. Its stock is owned principally by its officers and employees. Midwestern Waffles, Inc. ("Midwestern Waffles") is an Illinois corporation of which Rex Waldrop and Edwin Waldrop are shareholders.

Waffle House operates a trademark restaurant system with some unique features. It owns and operates some restaurants on the retail level in certain territories, and other territories have been exclusively allocated to franchisees for operation of Waffle House restaurants. Waffle House or Waffle House employees, officers, or shareholders have interests in corporations which own and operate certain of the Waffle House franchises.

Plaintiff asked defendants for a Waffle House franchise in Selma, Alabama, in late September or early October of 1972. Plaintiff was told that the area was not available for a franchise because Alabama had already been allocated between the company and other franchisees for operation of Waffle House restaurants. Central Illinois

was a territory available for a franchise at the time, and in late 1972, Midwestern Waffles, known at the time as Waldrop-Henry Waffles, Inc., became a Waffle House franchisee for that territory.

Rex Waldrop initially remained in Selma, Alabama, while Steve Henry worked as the general manager for Midwestern Waffles in Illinois. After Steve Henry's resignation from Midwestern Waffles and the expansion of the franchise into the St. Louis area, Rex Waldrop moved to St. Louis to become general manager for Midwestern Waffles.

Midwestern Waffles opened two Waffle House restaurants, one in 1974 and one in 1976. Plaintiff executed a Standard Franchise Agreement prior to the opening of each restaurant, and they also executed Area Development Agreements which controlled where they opened restaurants and whether they built additional ones. Again in 1974, Edwin and Rex Waldrop requested that they be given the Selma or other area in Alabama which had not been developed. This was denied.

Orders were placed for plaintiff's restaurant equipment with The Hickman Company, in which Waffle House had a financial interest. Metro Distributors, Inc., in which Waffle House also had a financial interest, helped arrange for vending machines for plaintiff's restaurants. In 1977, Waffle House bought plaintiff's restaurants from them, and plaintiff is dissatisfied with the price paid it and the method of arriving at that price.

██ Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Antitrust cases by their very nature are often poorly suited for disposition by summary judgment motion, since antitrust cases often raise questions of motive, credibility, and conspiracy. 10 C. Wright & A. Miller, Federal Practice & Procedure, § 2732, at 608–10 (1973). *See Poller v. Columbia Broadcasting System, Inc.,* 386 [368] U.S. 464 [82 S.Ct. 486, 7 L.Ed.2d 458] (1962). On the other hand, "it is now settled that summary judgment is appropriate in those antitrust cases where plaintiffs, after having engaged in extensive discovery, fail to produce 'significant probative evidence' in support of the allegations in their complaint." *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 513 F.Supp. 1100, 1140 (E.D.Pa.1981). *See Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 553–54 (5th Cir.1980), *cert. denied,* [454 U.S. 927] 102 S.Ct. 427 [70 L.Ed.2d 236] (1981).

## II. WHETHER PLAINTIFF HAS ESTABLISHED ANY EVIDENCE OF INJURY FROM ANY ALLEGED ILLEGAL TYING ARRANGEMENTS.

Plaintiff's allegations regarding any illegal tying arrangements are as follows. During the time relevant to the complaint in this action, Waffle House required its franchisees to purchase certain equipment for the operation of the franchisees' stores. This requirement was imposed by certain provisions of the franchise agreements. Plaintiff's Supplemental Statement of Facts, ¶ 14.[1] The standard procedure for Waffle House to follow when granting a new franchise was to effect the purchase of the initial equipment package required by the franchise agreement by having an employee of Waffle House, instead of the franchisee, place the order with The Hickman Company on behalf of the new franchisee. This action was taken with no prior consultation with the franchisee. *Id.,* ¶ 15. The plaintiff was never furnished with specifications of what equipment was required for a Waffle House restaurant, and, no such specifications existed, since such matters were under the control of The Hickman Company. *Id.,* ¶ 16. *See also* Affidavit of Rex P. Waldrop, ¶¶ 9–15 (at-

---

**1.** Editors Note: No text for footnote 1 appears on the manuscript copy of the order.

tached to Plaintiff's Motion for Summary Judgment with Supporting Papers, filed January 28, 1980). As a result, plaintiff was effectively coerced into purchasing its equipment from The Hickman Company. Statement, ¶ 17. Metro Distributors, Inc. was the only agent designated by Waffle House in accordance with paragraph 31 of the franchise agreement through which the franchisee could acquire vending machines to be used in its restaurants. *Id.*, ¶ 18. Both Waffle House and Metro Distributors, Inc., received a percentage of the revenue from the operation of vending machines in the franchisees' stores. *Id.*, ¶ 19.

Given these allegations, plaintiff contends that two demonstrations of injury result. First, plaintiff points to evidence in the record that a portion of the vending machine net profits was payable to defendants. Plaintiff states that the vending machine revenue received by plaintiff was one-half of that received by defendants, and therefore "[t]his is clear evidence of a decrease in revenues *directly related* to defendants' tie-in." Memorandum of Authorities in Support of Plaintiff's Supplemental Response to Defendants' Motion for Summary Judgment, at 24 (emphasis in original). Second, plaintiff points to the record as showing that defendant Hickman Company purchased standard equipment from various manufacturers and resold that equipment to franchisees at a cost plus a mark-up. Plaintiff asserts that the mark-up to franchisees such as the plaintiff was greater than that charged to the company-owned stores, thereby showing not only the coercive power of defendants, but also showing the injury suffered by the plaintiff. *Id.*

The seminal case which articulated a standard for determining the existence of injury in tie-in situations is *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir.), *cert. denied*, 405 U.S. 955 [92 S.Ct. 1173, 31 L.Ed.2d 239] (1972). In *Siegel*, the franchisor required all prospective franchisees to purchase from it cookers, fryers, packing supplies, and mixes as a condition of obtaining a license to use the franchisor trademark. Holding that economic harm was not inferable automatically from the occurrence of tie-in, the Ninth Circuit offered a specific guideline from which the fact of concrete financial damage must be demonstrated:

·To ascertain whether an unlawful arrangement for the sale of products has caused injury to the purchaser, the cost or value of ·the products involved, free from the unlawful arrangement, must first be ascertained.

448 F.2d at 52. Recently, the Eleventh Circuit in *Kypta v. McDonald's Corp.*, 671 F.2d 1282 (11th Cir.1982), indicated that *Siegel* stands for the proposition that injury resulting from a tie-in must be shown by establishing that payments for both the tied and tying products exceeded their combined fair market value. *Id.*, at 1285. The court amplified as follows:

The rationale behind this requirement is apparent: A determination of the value of the tied products alone would not indicate whether the plaintiff indeed suffered any net economic harm, since a lower price might conceivably have been exacted by the franchisor for the tying product. Unless the fair market value of both the tied and tying products are determined and an overcharge and a complete price found, no injury can be claimed; suit, then, would be foreclosed.

*Id.* In *Kypta*, a franchisee brought an action against a franchisor alleging antitrust violations by requiring all franchisees to be tenants of the franchisor and to pay the franchisor a non-assignable, interest-free security deposit. The court held that since the franchisee failed to come forward with any evidence of actual injury caused by the alleged real estate tie-in, the franchisee could not recover against the franchisor.

█ With respect to plaintiff's assertion of injury resulting from the purchase of equipment from The Hickman Company, plaintiff fails to show the value of both the Waffle House franchise license and equipment purchased from Hickman. Furthermore, plaintiff does not refer to any compa-

rable equipment that could have been obtained from other sources at cheaper prices, thereby estimating the value of the package compared to other alternative products. Plaintiff simply relies on the fact that Hickman charged the Waffle House Company restaurants less than it charged franchisees. This, however, provides no evidence that plaintiff suffered any net economic harm from the alleged illegal tying arrangement involving Hickman. In addition, defendants explain this difference in price as a result of the recommendations by Waffle House's accounting firm, beginning in 1976, that generally accepted accounting principles precluded Hickman Company, a wholly owned subsidiary of Waffle House, from factoring in any profit on sales to Waffle House. Defendants' Memorandum in Response to Plaintiff's "Papers" on the Issue of Antitrust Injury, at 5. Simply put, the difference in price charged by The Hickman Company in no way indicates that plaintiff could have obtained equivalent equipment at a lower price from other sources, or that the value of both the Waffle House franchise license and Hickman equipment was less than the price paid by plaintiff.

█ With respect to plaintiff's assertion of injury on the alleged illegal tying arrangement involving vending services provided by Metro Distributors, plaintiff relies on the payment of 50% of vending income to Waffle House and Metro, and argues that this amount itself establishes antitrust injury. Again, plaintiff has failed to offer any evidence that the overall package was overpriced, and that plaintiff suffered any net economic injury. Furthermore, plaintiff's argument "that a portion of the vending machine net profits were payable to defendants, a practice which would not have existed but for the tie-in," Memorandum of Plaintiff at 24, is misplaced. Plaintiff has not shown that alternative sources of comparable products would have been available, but for the alleged tie. See *Krehl v. Baskin-Robbins Ice Cream Co.*, 78 F.R.D. 108, 120 (C.D.Cal. 1978), *aff'd*, 664 F.2d 1348 (9th Cir.1982).

Accordingly, defendants are entitled to summary judgment on plaintiff's antitrust claims involving Hickman and Metro for the alleged illegal tying arrangements. *Kypta v. McDonald's Corp., supra.*

### III. WHETHER PLAINTIFF HAS ESTABLISHED ANY EVIDENCE OF ANTITRUST INJURY FROM ANY ALLEGED ILLEGAL DIVISION OF TERRITORIES.

In addition to alleging unlawful tying arrangements, plaintiff has alleged that defendant has unlawfully allocated markets. Also, it is alleged that defendant's failure to facilitate expansion within the Illinois territory prevented plaintiff from commercially exploiting the territory which it was granted, thus coercing a forced sale of plaintiff's properties to Waffle House in furtherance of an attempt to monopolize the market. The allegations regarding this attempt to monopolize have previously been decided by this court adversely to plaintiff. Accordingly, the court is of the opinion that none of the alleged foot-dragging and other reputed acts of bad faith relative to the development of the Illinois market are relevant to a decision on the allegations of unlawful territorial allocation.

Plaintiff contends that it was affected in two ways by the territorial allocation policies of Waffle House. First, it was denied the right to enter the Alabama market. *See* Plaintiff's Supplemental Statement of Facts, ¶¶ 10–12. Second, after it was granted a franchise in Illinois, it was denied the right to expand beyond its franchise area. *See id.*, ¶¶ 21, 24, 25, 30.

Plaintiff relies heavily on the fact that officials at Waffle House who had some power over the approval of franchise territories were also owners of franchisees. It is understood that some of these franchisees held a territorial allocation in the State of Alabama. From this, the plaintiff would have the court conclude that the market allocation was horizontal instead of vertical. Generally, horizontal allocations of markets are said to be *per se* violations of the antitrust law, and, therefore, it is

unnecessary to make any further showing of their anticompetitive effect.

As the court has noticed previously, there seems to be a genuine issue respecting whether these officials used their power with Waffle House to protect the franchise territories already assigned to their own companies. Under the facts of this case, however, that issue is not material or relevant.

■ It is said that a non-price horizontal restraint of trade such as territorial restrictions between competitors are illegal *per se*, because they have no purpose except the stifling of competition. *United States v. Topco Associates*, 405 U.S. 596 [92 S.Ct. 1126, 31 L.Ed.2d 515] (1972); *United States v. Sealy*, 388 U.S. 350 [87 S.Ct. 1847, 18 L.Ed.2d 1238] (1967). On the other hand, territorial restrictions of a "vertical" nature (between the parties at different levels of the market structure)—such as those which may be contained in franchising agreements—are analyzed under a rule of reason, because they promote interbrand competition by allowing the franchisor or manufacturer to achieve certain efficiencies in the distribution of his goods and services. *Continental TV, Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 [97 S.Ct. 2549, 53 L.Ed.2d 568] (1977). The reasonableness of a particular non-price vertical restraint is judged by whether it produces an anticompetitive effect in interbrand competition in the relevant geographic and product markets and not merely by whether it reduces intrabrand competition. *Carlson Machine Tools, Inc. v. American Tool, Inc.*, 678 F.2d 1253, 1262 (5th Cir.1982).

This distinction is plausible where the allocation facilitates price maintenance in the relevant product market, but it is implausible where the allocation does not act as a bar to entry or competition in the relevant market. As noted previously, whatever the relevant market is here, it is a great deal broader than the Waffle House system and encompasses much, if not all, of the fast food industry.[2] Where the relevant market is so much larger than that portion which may be influenced by certain horizontal competitors, it cannot be seriously contended that whatever restrictions are imposed in fact appreciably stifle competition. Consequently, after further reflection, this court is of the opinion that for the purposes of this case, the territorial allocations of Waffle House should be viewed as though they are vertical and shall be therefore analyzed under the rule of reason.

A different approach leads to this same point for the beginning of the analysis. Because of the symbiotic relationship between Waffle House and some of its franchisees, and because Waffle House itself operates restaurants, it might be considered that a dual distributorship exists in the case at bar. Dual distributorships exist where the franchisor not only licenses independent franchisees but also operates its own franchises. As the franchisor, the company is vertically related to its franchisees. As a franchisee it is horizontally related. There is an emerging tendency by the courts to view the primary relationship between a dual distributor and an independent franchisee as vertical where the restrictions do not lessen interbrand competition or decrease the availability of goods or services. *See, e.g., Copy-Data Systems, Inc. v. Toshiba American, Inc.*, 663 F.2d 405 (2d Cir.1981); *Krehl v. Baskin-Robbins*

2. The process of defining a relevant market is well stated by Professor Areeda:

A vast number of firms might have some actual or potential effect on a defendant's behavior. Many of them, however, will not have a significant effect and we attempt to exclude them from the "relevant market" for appraising defendant's power. We try to include in the relevant market only those suppliers—of this same or related product in the same or related geographic area—whose existence significantly restrains defendant's power. This process of inclusion and exclusion is spoken of as "market definition."

P. Areeda, Antitrust Analysis: Problems, Text, Cases ¶ 231, at 239–40 (1981).

Here, generally speaking, the relevant market is restaurants similar to Waffle House—those with similar menus, hours, and service.

*Ice Cream Co.*, 664 F.2d 1348 (9th Cir. 1982).

 Because there is no evidence here that the territorial allocation made by Waffle House even under the circumstances alleged by the plaintiff, has the tendency to reduce interbrand competition, reduce the availability of services within the relevant market area, or artificially maintain prices, a rule of reason analysis is appropriate.

 Franchisors, like other businessmen generally, have the right to select unilaterally those with whom they deal and to exercise their own discretion in continuing or terminating existing franchisees. *Compare United States v. Colgate*, 250 U.S. 300 [39 S.Ct. 465, 63 L.Ed. 992] (1919). The antitrust laws are designed to protect the consumer interest in competition, *Reiter v. Sonotone Corp.*, 442 U.S. 330 [99 S.Ct. 2326, 60 L.Ed.2d 931] (1979), and courts recognize that giving wide latitude to businesses in choosing methods of distribution and particular distributors promotes competition. *A.H. Cox & Co. v. Star Machinery Co.*, 653 F.2d 1302 (9th Cir.1981). Thus, the threat of a treble damages judgment arises only from those refusals to deal which are part of a plan of anti-competitive conduct involving more than one party. *Brattleboro Auto Sales, Inc. v. Subaru, Inc.*, 633 F.2d 649 (2d Cir.1980); *Hawkins v. Holiday Inns, Inc.*, 634 F.2d 342 (6th Cir.1980), *cert. denied*, 451 U.S. 987 [101 S.Ct. 2322, 68 L.Ed.2d 845] (1981).

In a franchisor-franchisee context, the cases uphold the right of a franchisor to refuse to grant a franchisee or to terminate a franchise as long as no anti-competitive motives for or effects of the franchisor's action exists. For example, in *Ron Tonkin Gran Tourismo, Inc. v. Fiat Distributors, Inc.*, 637 F.2d 1376 (9th Cir.), *cert. denied*, 454 U.S. 831 [102 S.Ct. 128, 70 L.Ed.2d 109] (1981), an automobile dealer brought an action against an automobile distributor and another dealer alleging federal antitrust violations as a result of the distributor's rejection of plaintiff's franchise application. The district court granted summary judgment for the distributor. The Ninth Circuit affirmed. On the issue of group boycott or concerted refusal to deal, the court held that because of the distributor's small percentage of the relevant market, the distributor's decision not to appoint an additional dealer cannot be perceived as so plainly anticompetitive so as to utilize a *per se* rule. *Id.* at 1388. As the court cogently stated: "Appellant has simply failed to evince 'significant probative evidence' of a substantially adverse effect on competition." *Id.* Furthermore, the court provided the following interest analysis:

Businessmen may, within certain limits, decide to deal with whom they wish. Our conclusion, or a plaintiff's, that a defendant exercised poor business judgment, that a defendant treated someone unfairly, or that a potential competitor has been injured does not mean that the antitrust laws have been violated. The cases discussed above indicate that the courts are reluctant to interfere with a company's business decision to distribute its products in a particular fashion. We do not expect businesses to be run in an altruistic fashion, but, particularly when there is vigorous interbrand competition, "the interests of the manufacturer and a consumer with regard to product distribution coincide." 92 Harv.L.Rev. 1160, 1164 (1979). It is the interests of FDI to see that its product is distributed in an efficient fashion. The economic interests of FDI dictate that it seek to improve sales. It is clear that the desire to stimulate sales was a factor in FDI's decision not to appoint an additional dealer. Appellant seems to recognize this, but it continues to attach talismanic significance to the existence of an additional competitor. The antitrust laws are concerned with competition and we must recognize that FDI's decision not to appoint an additional dealer in an effort to expand its small share of the market had the potential to benefit competition. Accordingly we cannot say that the use of a *per se* rule would be justified. There is assuredly no "significant probative evidence" which would indicate that the

challenged product had or was likely to have a pernicious effect on competition or lacked any redeeming virtue. *Id.* at 1387–88. *See also Continental TV v. GTE*, 433 U.S. 36, 58 [97 S.Ct. 2549, 2561, 53 L.Ed.2d 568] (1977); *Walner v. Baskin-Robbins Ice Cream Co.*, 514 F.Supp. 1028 (N.D.Tex.1981) (franchisor's refusal to approve transfers of franchises upheld in absence of evidence of anti-competitive effect).

Indeed, franchising has stimulated the entry of additional competitors into the marketplace because of the numerous advantages that it offers to both the franchisor and franchisee. From the standpoint of the franchisee, franchising offers:

(i) The likelihood of lower start-up capital;

(ii) Management assistance and technical training provided by the franchisor;

(iii) The pre-existing good will and consumer acceptance inherent in dealing with a proven product;

(iv) Economies in purchasing and advertising equivalent to those available to chain store businesses.

2 Von Kalinowski, Antitrust Laws and Trade Regulation, § 6H.01, at 6H–3–4 (1981). From the standpoint of the franchisor, franchising provides the following advantages:

(1) Minimal capital investment;

(2) Site selection;

(3) Dealer selection;

(4) Quality control;

(5) Consistent pattern of dealings;

(6) Pricing policies; and

(7) Territorial controls.

*Id.* at 6H–3–4. Considering the relevant market in this case, it can be noticed that the franchising system has worked well in fostering entrance into the marketplace by many different purveyors of fast food. There is no showing here that the territorial allocation has any pernicious effect on competition within the marketplace or that it lacks any virtue. It is, then, not immediately obvious that the fact pattern before the court shows an anticompetitive effect.

Further, the refusal to allow Midwestern to operate in Alabama or elsewhere outside of Illinois does not restrict its right to trade at all in that market. Plaintiff has no protected right to operate under defendants' trademark and utilize defendants' expertise and good will in a market of its own choosing. As early as 1919, the Supreme Court stated:

The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade in commerce—in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell.

*Colgate*, 250 U.S. at 307 [39 S.Ct. at 468]. It cannot be said, then, that plaintiff's frustrated wishes to operate a Waffle House restaurant in Alabama constitute a harm protectible under the antitrust law contained in 15 U.S.C. § 1.

Further, the court would note that plaintiff cannot seriously contend that those things allegedly done by Waffle House which plaintiff contends prohibited it from expanding within its allocated Illinois territory is the result of any conspiracy among the franchisees controlled by Waffle House personnel and Waffle House. The final outcome of the adventure in Illinois speaks too strongly to the contrary. Waffle House bought out Midwestern. It kept the territory. There is no evidence that a specially favored franchisee profited from Midwestern's allegedly coerced sellout.

IV. ANTITRUST INJURY.

In any antitrust case the plaintiff must show antitrust injury of two types. First, he must show an injury to himself causally linked to illegal activities of the

defendant. Second, he must show that the defendants' activities have the effect of stifling competition. *Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477 [97 S.Ct. 690, 50 L.Ed.2d 701] (1977). As just discussed, this court is of the opinion that the territorial allocation policies of Waffle House do not materially affect the competitive environment within the relevant market. Even if a contrary result were reached under either a rule of reason analysis or because the territorial allocation was said to be horizontal and thus a *per se* violation, the court finds that the defendant has not demonstrated an injury to itself proximately caused by the territorial allocations.

In support of its position that it was injured from territorial restrictions, plaintiff submits the following:

(a) An affidavit from James L. Dent, Jr. which purports to establish that franchise operations will make more money if they are able to benefit from "economies of scale." *See* Plaintiff's Memorandum of Authorities, at 19–20; Affidavit of James L. Dent, Jr., ¶¶ 6–7.

(b) A comparison of profits between Midwestern's operations and those of other franchisees, such as Columbia Foods and Treetop, to establish that the operation of more restaurants suggests that more net profits will be generated. *See* Plaintiff's Memorandum of Authorities, at 16, 20; Statement, ¶ 35.

(c) A comparison of the profits of plaintiff's two restaurants in Illinois before and after plaintiff ceased to operate them. *See* Plaintiff's Memorandum of Authorities, at 22, 25; Statement, ¶ 34.

This evidence shows only that Midwestern Waffles could have made more money in the franchise area it was granted if Waffle House had allowed it to establish additional restaurants so that it could benefit from the "economies of scale." The conduct which allegedly caused this injury was the failure of Waffle House to allow

Midwestern to expand out of its franchise territory and/or into Alabama. There is no allegation by plaintiff that the territory granted was so restricted that it could not allow economies of scale if developed. For example, the court would notice that within the areas bounded by suburban St. Louis and 42 counties in central Illinois, there were undoubtedly many other locations well suited for the erection of additional restaurants.

Plaintiff must show that it was prepared and ready, willing and able to expand into other territories if it had been allowed. Beyond stating that it asked leave to operate in Alabama and other states, it has shown nothing concerning its ability to finance such expansion or to manage it. On this point alone it fails even to create an issue of fact for a jury. *Hayes v. Solomon,* 597 F.2d 958 (5th Cir.1979). Further, it makes no effort to project any economic losses from its inability to operate restaurants in Selma or Alabama or Texas or elsewhere, taking into account the competitive environments in those other markets, the geographic dispersion of its operations as it might affect the economies of scale, and its ability to operate any Waffle House on a profitable basis. Nowhere does the court find any analysis of the cost of capital or facilities or projections made taking into account variations in the cost of supplies, food, and labor. The plaintiff contends that it was injured because it was not allowed to enter into trade. It was, in fact, allowed to enter into trade in one market area, and from the evidence adduced, it never made a profit. This court will not assume that plaintiff could have operated Waffle House restaurants in Alabama any more successfully than it operated them in Illinois in the absence of some concrete evidence of that fact in the record.

 Accordingly, the court is of the opinion that the plaintiff has failed to demonstrate an economic injury to its business or property,[3] much less injury proximately caused by the territorial allocations of the defendant.

**3.** Section 4 of the Clayton Act 15 U.S.C. § 15 conditions a private action on this showing. Even if the practice is a *per se* violation of the

law, the plaintiff must show economic injury to itself. *Warriner Hermetics, Inc. v. Copeland Refrigeration,* 463 F.2d 1002, 1016 (5th Cir.1972).

## V. CONCLUSION.

On March 15, 1982, this court made four conclusions: (1) Rex Waldrop does not have standing; (2) defendants are entitled to summary judgment on plaintiff's claim that defendants violated Section 2 of the Sherman Act by engaging in a monopoly; (3) defendants are entitled to summary judgment as to plaintiff's claims of restraints of trade, other than the alleged horizontal territorial allocation and the alleged illegal ties; and (4) defendants are entitled to summary judgment on plaintiff's state law claims for antitrust damages, unjust enrichment, tortious interference with contract, and unfair competition.

Given the conclusions reached today, defendants' motion for summary judgment is hereby GRANTED.

The Clerk of Court is hereby DIRECTED to enter judgment for the defendants.

Said another way, plaintiff must show the fact of injury which means that what the defendant did impacted in some way on plaintiff's business. To show injury means that plaintiff must be able to demonstrate that it suffered economic damages which are quantifiable. *McClure v. Undersea Industries,* 671 F.2d 1287, 1289 (11th Cir.1982). *See also Keener v. Sizzler Family Steak Houses,* 597 F.2d 453 (5th Cir.1979); *H & B Equipment Co. v. International Harvester Co.,* 577 F.2d 239 (5th Cir.1978); *Kestenbaum v. Fal-*

*staff Brewing Corp.,* 514 F.2d 690, 694–95 (5th Cir.1975), *cert. denied,* 424 U.S. 943 [96 S.Ct. 1412, 47 L.Ed.2d 349] (1976); *Pitchford v. Pepi, Inc.,* 531 F.2d 92, 104–05 (3d Cir.1975), *cert. denied,* 426 U.S. 935 [96 S.Ct. 2649, 49 L.Ed.2d 387] (1976); *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 20 (5th Cir.), *reh'g en banc denied,* 496 F.2d 878 (5th Cir.), *cert. dismissed,* 419 U.S. 987 [95 S.Ct. 246, 42 L.Ed.2d 260] (1974).